UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Michael Pierce | § | CIVIL ACTION NO. 13-2276 |
| Plaintiff, | § | |
| | § | |
| vs. | § | PLAINTIFF'S ORIGINAL |
| | § | COMPLAINT |
| | § | |
| San Jacinto College District, | § | |
| Defendants. | § | |
| | § | A JURY IS DEMANDED |

**Original Complaint**

Michael Pierce brings this lawsuit to challenge age-based discrimination and the retaliation he suffered for telling the truth about his employer's discrimination and mismanagement. The San Jacinto College District chose to enact a blatant campaign to make its campus police department younger, and then it punished Michael Pierce for speaking out against the College's discrimination against himself and others.

**Parties**

1. The plaintiff Michael Pierce is an individual who resides in Houston, Harris County, Texas.

2. The defendant San Jacinto College District ("the College"), is a locally controlled, public community college in Harris County, Texas. The College can be served through its Chancellor, Brenda Hellyer, 4624 Fairmont Pkwy, Suite 200, Pasadena, TX 77504.

**Jurisdiction**

3. This case is brought under the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq., and to redress the deprivation, under color of statute, ordinance,

> regulation, custom or usage of rights, privileges and immunities secured to the plaintiff under the First Amendment of the United States Constitution and 42 U.S.C. § 1983.

4. This Court has jurisdiction of this case according to 28 U.S.C. §§ 1331 and 1343.

5. Venue is invoked pursuant to 28 U.S.C. § 1391.

## Statement of the Plaintiff's Case

6. Pierce was born in 1946 and is now 66 years old.

8. Pierce served as a police officer for the Houston Police Department for over 27 years.

9. After retiring from HPD, Pierce worked as an officer for the College's police department ("the department") for nine years at its South Campus.

10. Captain Marion Mayo, who supervised Pierce at the College, recognized him for his fine performance with a positive evaluation shortly before Pierce was dismissed.

## Chief Van Slyke was Open About his Age Bias

11. In January 2011, the College hired Jeffrey Van Slyke as its new police chief.

12. Van Slyke brought a management style to the department that was not merit-based but was based instead on his stereotypes of people, including a bias against older workers. By the end of 2011, Van Slyke's bias had infiltrated all levels of the department. And it caused Pierce to lose his job on December 14, 2011.

13. Before Van Slyke was hired, the department had no Chief and the Vice Chancellor of Fiscal Affairs, Kenneth Lynn, oversaw the department.

14. Shortly after Chief Van Slyke started working for the College, he began openly admitting a bias against older officers.

15. Van Slyke did not appreciate the value of the experience that older officers brought to the job. Rather, he voiced a number of negative comments about older workers, including: "Don't listen to the old white guys, they are on their way out;" "This good ole boy retirement home is over.  They need to step aside for the younger officers;" and ""There is nothing but old white guys over 50 working here and that is going to change."

16. Van Slyke made these comments openly and repeatedly in supervisor meetings.

17. But evidence of Van Slyke's bias is not limited to what he said. He also acted on that bias. In a series of personnel decisions throughout 2011, his bias led him to hire inexperienced officers and quickly promote them to supervisor positions even though they were not the most qualified applicants.

Chief Van Slyke Rushes to Hire and Promote Unqualified or Underqualified Officers

18. Soon after he became Chief, Van Slyke hired 13 new officers in the span of two weeks.

19. In the law enforcement profession, thorough background checks are critical.

20. Pierce worked in HPD's Recruiting Division as a background investigator for approximately 12 years. He knows from experience that it takes longer than two weeks to do a complete background investigation on over 13 applicants.

21. Some of the officers that Van Slyke hired worked part-time for San Jacinto College and others had just graduated from nearby law enforcement academies.

22. Jeremy Reyes, whose most recent employment was as a clerk in the department, was offered a position as a law enforcement officer before a full background investigation was completed on him and before he attended state-mandated training. Van Slyke allowed

      Reyes to serve as an officer despite his lack of state-mandated training, telling Reyes he had a year to complete the course.

23. From March through April 2011, Van Slyke created three new sergeant positions within the department.

24. Rather than promoting the older, more experienced officers with better credentials, Van Slyke filled all three sergeant positions with younger, more inexperienced officers he had hired within the past month or two.

25. In that same time frame, Chief Van Slyke filled another sergeant position with Claude Ludwig, a younger man than Pierce.

26. Although Van Slyke pretended to use a common technique of having a board of individuals interview candidates for the supervisory positions, he made certain that most of the individuals serving on the boards were people he had himself hired and promoted.

27. Michael Taylor was one of the individuals who sat on numerous boards to fill supervisory positions of lieutenant and sergeant. At the time, Taylor had less than a year's experience as a police officer.

28. At the same time, Van Slyke excluded experienced officers from the interview boards, including Marion Mayo, Johnny Baxter, and Dickey Williams.

29. In June 2011, Van Slyke posted two lieutenant positions within the department.

30. While Pierce applied for these positions with Human Resources, the College never interviewed him.

31. Instead, Van Slyke filled these two lieutenant positions with two of the younger, less experienced sergeants he had just promoted from the new hires.

32. One of the lieutenants Van Slyke selected, Connie Bajula, did not come close to meeting the College's listed criteria for this position.

33. Bajula was between 40 and 50 years old at the time.

34. For example, the College's job listing for the lieutenant position required the applicant to have an Advanced Certificate from Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE). Bajula did not have that qualification.

35. The listing also called for ten years of police experience, but Bajula lacked ten years of experience as a full-time officer.

36. In August 2011, the College presented a "buy-out" offer to older officers for early retirement. Several older, experienced officers accepted, including Marion Mayo, Dickie Williams, Roger Carpenter, and David Freisleben.

37. According to one, Mayo, he accepted early retirement believing that Van Slyke's open hostility to older officers would make continuing to work for the department impossible. If not for Van Slyke, Captain Mayo would still be working for the College.

38. Mayo had never been disciplined in nineteen and a half years of service for the College. Yet, after Mayo announced he was going to accept the retirement package, Van Slyke made certain to give Mayo a bad performance review.

39. Mayo was replaced by Bajula.

40. Bajula was working as a part-time officer for the department when Van Slyke brought her up to full-time and then promoted her twice, first to sergeant and then to lieutenant, within a period of approximately four months.

41. Bajula's conduct as a lieutenant revealed the danger of selecting an under-qualified candidate.

42. On one occasion, Bajula gave Pierce an unlawful order to force a reporter to leave the Student Center, a public building, simply because Bajula did not like the questions she assumed the reporter was asking.

43. Bajula also routinely refused to listen to or accept suggestions from her subordinates.

44. Later in August 2011, two sergeant positions were posted. Pierce submitted an application.

45. This time, Pierce was interviewed. On the interview board were four younger, less experienced members of the department: Lieutenant Bajula, Lieutenant Villareal, Sergeant Ludwig, and Officer Miller.

46. Each of the officers on the interview board for these two sergeant positions were hired or promoted by Van Slyke in the few months he had served as Chief.

47. Van Slyke did not select any of the applicants for these sergeant positions.

<u>Pierce Complains of Age Discrimination and Retaliation Ensues</u>

48. On September 27, 2011, Pierce filed a formal complaint against Van Slyke for age discrimination after he was passed over for a supervisory position for which he was well qualified.

49. Pierce's complaint was reviewed by Sandra Ramirez, the College's Vice President of Human Resources, and Kenneth Lynn, the College's Vice Chancellor of Fiscal Affairs.

50. Within 24 hours of Pierce's complaint, Van Slyke hunted Pierce down in a parking lot on the South Campus where he was working.

51.  This was the first time Van Slyke had talked with Pierce while Pierce was on patrol.

52.  The following day, Pierce received a write-up from the College for acts that occurred weeks earlier and were totally misstated. This was the first time the College had ever written-up or disciplined Pierce.

53.  This was the first of many acts of retaliation that followed Pierce's complaints about discrimination and mis-management and that ultimately resulted in his termination.

54.  Soon after, the College would seize upon the fact that Pierce discussed glaring misconduct committed by one of the officers Van Slyke had promoted, Sgt. Ludwig. But Pierce was not the only officer who was critical of Ludwig's misconduct.

<u>Another Officer Commits Misconduct, Yet Pierce Gets Fired</u>

55.  Ludwig's misconduct started with an incident in the early morning hours of October 2, 2011. At 2:00 A.M. he arrived on the scene of a dispute between several individuals who appeared to be intoxicated. He did not follow standard police procedure and separate the parties to interview them. Instead, the first thing Sgt. Ludwig did was order one group of individuals to leave the scene.

56.  After this serious breach of protocol, Sgt. Ludwig then asked the remaining party, Stephen Jaramillo, if he had a gun on him. Jaramillo advised Ludwig that he had a concealed handgun in his car.

57.  Sgt. Ludwig proceeded to confiscate Jaramillo's gun and his concealed weapon permit.

58.  Ludwig told Jaramillo that he was going to file charges on him for carrying a firearm on a higher learning campus. Ludwig never did follow through with that.

59. By allowing two people he believed to be intoxicated to get in their cars and drive away from the College, Ludwig put the public at risk.

60. No law enforcement official should fail to investigate an incident before allowing one party to leave the scene. Neither should a law enforcement official let someone who he believes to be under the influence of alcohol get in a car and drive away. But Sgt. Ludwig did both of these things.

61. Later, Sgt. Ludwig told Jaramillo that, if Jaramillo filed a complaint against him for his actions, Ludwig would ensure that Jaramillo would lose his concealed weapon permit.

62. Jaramillo nonetheless attempted to file a complaint against Sgt. Ludwig with the department. Soon after, however, the department told him it was not necessary because the matter had been closed.

63. Many officers in the department were stunned by this sequence of events, by Ludwig's behavior, and by Ludwig's misconduct and deficient report. This became a topic of common discussion.

64. But, rather than responding to this situation by investigating Sgt. Ludwig's misdeeds, Van Slyke instead accused Pierce of improperly releasing the report to someone outside the College. But Pierce had not shared the report outside the department. He had let John Marines, a part-time officer for the College, read the report. Officer Marines later admitted giving the report to his cousin, Jaramillo.

65. There is no requirement to seek authorization before showing any department report to another College officer.

66. College officers regularly shared reports not only with each other, but also with other agencies, like the Houston Police Department and the Pasadena Police Department. Officer Marines worked as a part-time officer for the College and was in the same position as any other officer with the College. He had an email account with the College and was authorized to access the department's computer system and make and read department reports.

67. Far from being improper, it was standard operating procedure for Pierce to share a report with a fellow officer of the department.

68. Van Slyke showed no interest in resolving a serious problem with Ludwig, one of his handpicked supervisors. Instead, he showed great interest in punishing Pierce over a false allegation.

69. Pierce was interrogated based on an alleged complaint made against him for releasing the report. But the following day the College admitted that no complaint had actually been made.

70. Van Slyke ordered Assistant Chief Carriker to record the interrogation of Pierce on November 14th. At the end of that interrogation, Carriker handed Pierce a letter signed by Van Slyke suspending Pierce. Van Slyke had already determined Pierce was guilty before the interrogation took place.

71. In Carriker's interview with Pierce, Carriker asked whether Pierce had allowed anyone to read the report prepared by Sgt. Ludwig. Pierce readily agreed he had done so, telling Carriker he shared the report with Marines.

72. In a letter dated December 14, 2011, Lynn informed Pierce that the College was firing him for supposedly sharing the report outside the College.

73. Five days later, in a letter dated December 19, 2011, Lynn notified Pierce that the College denied Pierce's grievance of the age discrimination he had suffered and about which he had complained in September.

74. Lynn and Ramirez, the same people who reviewed Pierce's complaint of age discrimination in September 2011, also reviewed the allegation against Pierce that led to his termination.

75. When Pierce appealed his termination, the College upheld it for a different reason, saying that the termination was justified because Pierce had not been honest during his interrogation by the Assistant Chief. While the College claimed Pierce did not admit giving the report to the part-time officer, the department's own investigation into the matter found that Pierce had admitted giving the report to the part-time officer. But still Pierce was dismissed.

76. At the same time the College fired Pierce, the College fired another older officer, Keith Brack, who was also accused of improperly sharing Ludwig's report with Marines.

77. Pierce timely filed a charge of discrimination with the Equal Employment Opportunity Commission. After 180 days passed, Pierce requested a right-to-sue letter. Pierce received a right-to-sue letter from the United States Department of Justice, and timely files this complaint.

**Causes of Action**

Age Discrimination and Retaliation

71. The College's conduct violates the Age Discrimination in Employment Act, which prohibits discrimination in employment on the basis of age, and retaliation against an individual for reporting such discrimination.

<u>Constitutional Violations</u>

72.  The College's conduct also violates 42 U.S.C. §1983, which prohibits deprivation, under color of statute, ordinance, regulation, custom or usage of rights, privileges, or immunities secured by the constitution and law.

73.  The College's conduct violates the First Amendment of the United States Constitution.

**Damages**

74.  The College's actions caused damages to Pierce in the form of lost wages and benefits income.

75.  The College's actions also caused Pierce compensatory damages including mental anguish and emotional distress.

**Relief Requested**

76.  The plaintiff asks this court to enter a judgment:

   a.  Declaring that the acts and practices complained of in this Complaint are in violation of the ADEA;

   b.  Enjoining and permanently restraining these violations of the ADEA;

   c.  Declaring that the acts and practices complained of in this Complaint are in violation of the United States Constitution;

   d.  Enjoining and permanently restraining these Constitutional violations;

   e.  Directing the defendant to pay plaintiff actual and compensatory damages that he suffered, past and future;

   f.  Awarding plaintiff pre-judgment interest on the amounts owed at the maximum rate allowed by law;

g. Awarding plaintiff the costs of this action, together with reasonable attorneys' fees and expert witness fees;

h. Awarding plaintiff post-judgment interest on the amount of judgment until paid at the maximum rate allowed by law; and

i. Awarding plaintiff such other relief, legal or equitable, as may be warranted.

Respectfully submitted,

   /s/ Paul R. Harris
Paul R. Harris*
Southern Dist. ID 897365
State Bar No. 24059905
Katherine L. Butler
Southern Dist. ID 4734
State Bar No. 03526300
1007 Heights Boulevard
Houston, Texas  77008
(713) 526-5677
(888) 370-5038 (fax)
* Attorney in charge for the Plaintiff
Michael Pierce